HOUSTON BELT & T. RY. CO. v. CHRISTIAN. (No. 7620.)

(Court of Civil Appeals of Texas. Galveston. Jan. 14, 1918. Rehearing Denied Feb. 20, 1919.)

1. COMMERCE �köß8(6) — FEDERAL EMPLOYERS' LIABILITY ACT—APPLICABILITY.

Where plaintiff was injured while employed by a railroad company on work connected with interstate commerce, the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) governs, and the defense of assumption of risk is available.

2. MASTER AND SERVANT ⊙288(2)—INJURIES TO SERVANT—ASSUMPTION OF RISK—JURY QUESTION.

In an action by the engineer of a wrecker used to move derailed cars, for injuries received when the cables broke, the question whether he assumed the risk of injury from defective cables and from the fact that no outriggers were used before attempting to move a derailed box car, held, under the evidence, for the jury.

3. MASTER AND SERVANT ⊙222(2) — INJURIES TO SERVANT—ASSUMPTION OF RISK.

In determining whether an engineer of a railroad wrecker, who was injured while complying with commands of his foreman, assumed the risk of injury because outriggers were not set out, the question is not whether the engineer used ordinary care in ascertaining whether outriggers were set out, but whether he had actual knowledge of the necessity for using them, or whether the omission was so plainly observable that he would be presumed to have known of it.

4. APPEAL AND ERROR ⊙1170(9)—REVIEW— HARMLESS ERROR.

In an action by the engineer of a railroad wrecker injured when cables broke while he was working under a foreman, a charge on as-

sumption of risk, though erroneous, in allowing the jury to consider certain promises to repair, *held* harmless, under rule 62a (149 S. W. x), in view of the circumstances and the fact that the foreman knew of the defects, and was in a position to judge of the weight of the car to be lifted.

Appeal from District Court, Harris County; Henry J. Dannenbaum, Judge.

Action by W. W. Christian against the Houston Belt & Terminal Railway Company. From judgment for plaintiff, defendant appeals. Affirmed.

Andrews, Streetman, Burns & Logue, of Houston, for appellant.

W. J. Howard and Clarence Kendall, both of Houston, for appellee.

GRAVES, J. [1] This appeal proceeds from a judgment for $8,000 damages for personal injuries in favor of Christian against the railway company, entered upon a verdict returned in response to special issues. Since the facts showed the work in which the accident occurred to have been in furtherance of interstate commerce, thus bringing the action within the purview of the federal Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. §§ 8657–8665]), and consequently making the common-law doctrine of assumed risk applicable, the court, pursuant to appropriate pleadings by appellant interposing it, accordingly gave a charge upon that defense, around which most of the questions presented to this court revolve.

It is first said there should have been an instructed verdict for it, as appellant requested below, upon its claim that as a matter of law, under the undisputed evidence, Christian assumed the risk of every danger and hazard that could have been a proximate cause of his injuries. This contention necessarily brings in review the entire case as made, but could not prevail if any one of the four separate and distinct grounds of negligence alleged was not only in the first instance properly established, but thereafter maintained as against the defense of assumed risk.

Christian was employed as engineer on appellant's wrecker, a machine used in clearing away wrecks upon its railway lines, and at the time of his injury was acting under the direction of Morgan, the company's superintendent, who had charge of the work, in the effort to lift up and place back upon its own trucks on the track a heavily loaded box car, which had previously been derailed. The machinery of the wrecker, which was placed upon and so fitted to an ordinary flat car by means of a large iron pin projecting down from it into a heavy metal casting so imbedded in the floor of the car as to permit rotation of the entire appliance upon this pin as an

axis, consisted of a boiler, boom, and cab, with cables running from the cab over the top of the boom, and thence down to the box car to be lifted. This rotary arrangement allowed the wrecking machinery to describe an entire circle, hence to become directly crosswise, or at right angles with the length of the flat car upon which it rested, and when that was done, its cab extended out beyond the side of the flat car furtherest from the load for several feet. Such was practically its position when the accident here involved was brought about.

In attempting to raise and so shift one end of the heavily loaded box car, it being full of cotton seed, as to make it fit down properly onto its trucks, the cable upon which its weight was suspended suddenly broke, letting the long boom drop forward down across the box car upon that side, and the cab of the wrecker in which Christian was stationed fall backward to the ground upon the opposite or outer side of the flat car with such force as to throw him out and injure him, the flat car itself being tilted in the same direction up off of one rail to the extent of an angle anywhere from 12 to 45 degrees wide.

Superintendent Morgan's own statement of the relative duties of both Christian and himself, and of how the accident happened, is shown in these excerpts from his testimony:

"After we came to the point where I decided we would be in the clear to handle the box car, I had the switch engine cut loose and taken away from the wrecker, and swung the wrecker around; the truck would not quite go under the car, the center plate, the two center plates —the male and female casting—would not pass. by about, I guess, a couple of inches, and I examined it and told Christian to raise her up a little, and he said, 'Do you reckon I can do it?' and I says, 'Let's raise it higher; we have got to have it higher to place it in the truck;' and when he raised it higher and just about the time the car was up and just as I was going to holler, 'Whoa,' why, the lines broke in the boom, snapped. That let the boom fall right across the car of cotton seed, and let the machine, of course, tilt back. The boom was supposed to counter balance the boiler, which is in the back end of the machine, and when the boom fell on the car there was no weight there for it to counter balance with, and, of course, it naturally turned that part back. * * * Mr. Christian was engaged in handling the movement of that wrecker from the time we stopped there; he is the man who swung the wrecker around after the switch engine had been cut off; he is the man who handled the levers in swinging it around. It took about five seconds to a half a minute to swing that machine around, and the accident occurred after that just as quick as we could lift up; just as quick as he could get his levers and lift up. I told him to lift it up, and he said did I think she would stand it, and I said it had stood it for about 200 lifts like that, and he made the lift when I told him so."

Christian's version did not materially differ, he saying upon the same matter, and with reference to Morgan's authority over him:

"At the time I was injured I was working under Mr. Morgan. Mr. Morgan was supposed to be the general boss out there at the time we were picking up this wreck. Mr. Morgan was giving all the orders during the work. He had the right to give orders, and I was required to take his orders. I either had to take his orders or quit. * * * He kept telling me she would stand a little more. We was trying to get this car up off the block. When he told me it would stand a little more, I give her a little more steam, to raise that up a little bit, and get it up off of those blocks; and after we got the car up off the ties, Mr. Morgan says, 'Swing south just the least little bit,' and just as I went to give her a little steam to swing that car, she went off—just turned over like a shot out of a gun just as soon as I began to give her a little steam, and it was all done just like batting your eye. She threw me out of the side door of the machine, and I landed on the side of the car."

Now, as applied to this situation, the several respects in which negligence was charged against appellant were in substance and effect essentially these: (1) In using weak and defective cables on the machines; (2) in permitting the work to be done with the metal casting in the floor of the flat car badly broken or cracked; (3) in failing to use "outriggers" as a protection against the very heavy load, it being averred that if these had been properly employed the accident would have been prevented; and (4) in allowing the overloading of the wrecker and cables in the condition they were in at the time.

In response to special issues separately embodying them, the jury found the railway company guilty of negligence in each of the particulars so specified, that each one of such negligent acts had been a proximate cause of Christian's injuries, and expressly acquitted him of having assumed the risk of any one of the conditions named, except as to the overloading of the wrecker and cables, concerning which alone that particular question was not submitted to them.

It is not contended here nor elsewhere in appellant's brief, indeed could not properly be under the uncontroverted evidence, that the cable and casting were not in fact defective, nor that the "outriggers" were used, nor yet that the load was not beyond the strength of the cable, but the complaint against these findings is, primarily through the first assignment, of their having been permitted to be made at all, as against the claim that the risks they dealt with had all been assumed by the appellee, and secondarily through a number of succeeding assignments, of the way in which the issues that elicited them were presented to the jury.

The proof was likewise undisputed that for some time prior to the accident Christian had known of the defects in the cable and the casting, but had repeatedly reported and complained about their condition, and had received assurance that it would be remedied, the last time during the month of August before his injury in September, when the master mechanic of the company, Mr. Jacobs, directly promised to repair them, coming out to the machine himself, and having his machinist take the dimensions of the broken parts, and make upon blueprints an itemized list of what was wanted.

Preceding these several questions as to the detailed acts of negligence charged, the court had, after first properly defining negligence, ordinary care, and proximate cause of an injury, given this charge upon the question of assumed risk:

"By 'assumed risk,' as used in this charge, is meant that if an employé knows of a defect or condition, which thereafter caused an injury to him, and appreciates the danger and injury liable to result to him from such defect or condition if he continues thereafter in the service in question, or if in the performance of the duties of his position he must necessarily have known of such defects or condition, and must necessarily have appreciated the danger and injury liable to result to him from such defect or condition if he continues thereafter in the service in question, then the employé assumes the risk of being injured because of such defect or condition. But the employé does not assume such risk if he was *induced* to remain in the service by a promise of the employer to repair such defect or condition, if a person of ordinary care would, under all the circumstances, have relied on such promise and continued in the service, and such period of time had not elapsed after the promise was made, that the employé knew or should have known that the promise would not be performed."

The word "induced" has been italicized here to indicate this court's view of the meaning and effect of that part of the instruction.

[2, 3] Under the entire controversy thus at least in fundamental substance outlined, did the court err in declining to hold as matter of law that no single ground of liability had both been sufficiently alleged and established, or, to state it differently, that the undisputed evidence showed Christian to have assumed every risk or hazard that could have been a proximate cause of his injuries?

A careful consideration of the record, including the statement of facts, convinces us that it did not. The load being lifted was a very heavy one, the box car itself weighing 32,000 pounds, and the cotton seed within approximately 33 tons more, making an aggregate weight of about 49 tons, whereas the wrecking machine was only built to lift loads of 25 tons at 15 feet, 20 tons at 18 feet, and 30 tons at 12 feet; moreover, it was at night too dark to give a signal with the hand, and a lamp had to be used. Christian was up in his cab on the far end of the wrecker, in no position to observe or know anything

about the weight of the load, and there is not a syllable of evidence anywhere in the record indicating that he did in fact know anything about it.

A like condition obtains as to the admitted failure to use the "outriggers." These were simply movable iron bars so fitted under both ends of the flat car upon which the wrecking machine rested as to be readily pulled out upon whichever side of the car they were needed, at right angles with and to a distance of 4 or 5 feet from its sides, where they were blocked up with sticks of timber placed on the ground, their purpose being to prevent the tilting of the car in that direction.

The witnesses for both litigants united in testifying that outriggers were never set out in lifting light loads, but only when heavy ones were to be moved, and, as before stated, there was no proof whatever that Christian either knew the weight of the load he was here commanded to lift, or that it was heavy enough to require the use of these appliances. He was subject to the orders of Morgan, his superior, and had a right to assume that the latter would himself determine the question of whether or not the weight of the box car was such that ordinary care called for the placing of the outriggers. Especially is this true when Morgan, the superintendent in charge of the work, occupied a position of vantage over Christian in at least two vital respects: In being the foreman of the work with the right to require obedience to his orders from Christian, and in knowing, or what amounted to the same thing, of being under the duty of knowing the character and weight of the load he was undertaking to lift. In these circumstances the question is not one of ordinary care upon Christian's part in ascertaining whether the outriggers had been set out, but one either of his actual knowledge of the necessity for using them, and of the conceded failure to do so, or of whether that omission was so plainly observable that he would be presumed to have known of it. Panhandle Ry. v. Brooks, 199 S. W. 669; Gila Valley Ry. Co. v. Hall, 232 U. S. 101, 34 Sup. Ct. 229, 58 L. Ed. 524.

While appellant marshals a number of circumstances, such as the proximity and relative positions of the two cars, the number of openings in the cab of the wrecker, the unobstructed view, etc., from which it is argued that Christian must have known the outriggers were not placed, still he testified positively that he did not know it, and the jury's findings must be held to have resolved that issue in his favor. Neither can it be properly said, we think, that the circumstances first above detailed did not just as strongly tend to corroborate his denial and to rebut any presumption of knowledge as did those invoked by appellant to indicate the contrary. Obviously, no presumption that

he had the knowledge it is sought to thus bring home to him would as a matter of law arise out of a situation such as this, and the contention must be overruled.

The jury's further findings that these two negligent acts, that is, the failure to use the outriggers and the overloading of the wrecker and cables, were each a proximate cause of the injury also had ample support in the evidence. At this point it must be recalled that Morgan had precisely the same knowledge Christian did of the defective cable, and in addition had what the latter is thus found not to have had, knowledge of the weight he ordered Christian to lift.

Considering all the facts developed, therefore, it is not perceived how a court could hold as a matter of law that Christian assumed the risk of the two conditions shown with respect to the overloading and the failure to use the outriggers.

[4] But it is said the charge above quoted denied appellant the real benefit of its defenses of assumed risk, in that it failed to affirmatively submit the question of whether or not there had in fact been any promise to repair the defects shown to have existed in the cable and casting.

While we think this charge correct in so far as the substantive law is concerned, and that it closely tracks the rule laid down by the Supreme Court in Railway Co. v. Bingle, 91 Tex. 287, 42 S. W. 971, cited and relied upon in the briefs of both parties here, still, as we view the case, concession might be made that the negative or inferential form in which it permitted the jury to consider the matter of a promise to repair the cable and casting constituted error, without at the same time requiring a reversal, because, in our opinion, there was no such denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment against it. Rule 62a (149 S. W. x). Surely Christian, although knowing the weakened condition of the cable, could not be held to have assumed the risk of its being overloaded at the direct command of one who possessed like knowledge, but whose orders he was bound to take. In these circumstances, it logically follows that the promise to repair, which related alone to the casting and the cable, might be entirely disregarded without affecting his right of recovery; under this view, it might with like resulting effect be further granted that the defective condition of neither of these two appliances, concerning which the promise to repair was made, had anything to do with, or was approximate cause of, the injury. This is so for the reason that there is sufficient evidence in the record to have justified a specific finding not only that the cable would not have broken, even in its weakened condition, if it had not been grossly overloaded, but also that the accident could still have been prevented by the use

of the outriggers, despite the previous parting of the cable. The finding that such was the state of the proof is made after a careful examination of the record, but it is deemed unnecessary to catalogue the testimony here.

If, then, a judgment of affirmance can properly be rested upon the overloading and the failure to place the outriggers, as the fact, findings, and conclusions already stated not merely permit, but require, it is thought no useful purpose would be served by a discussion of the many further questions presented relative to the other acts of negligence.

All assignments are overruled, and the judgment is affirmed.

Affirmed.

---

⟺For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes